UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DENISE FARNSWORTH,                    )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )          Case No. 4:08CV01689 ERW
                                      )
COVIDIEN, INC., A DELAWARE CORP.,     )
                                      )
          Defendant.                  )

## MEMORANDUM AND ORDER

     This matter comes before the Court on Defendant's Motion for Summary Judgment [doc. #14] and Defendant's Motion to Strike [doc. #23].

## I.     PROCEDURAL BACKGROUND

     On November 4, 2008, Plaintiff Denise Farnsworth ("Plaintiff") filed a Complaint [doc. #1] against Defendant Covidien, Inc., a Delaware Corporation ("Defendant").[1]  Plaintiff's Complaint alleges age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA") and the Missouri Human Rights Act ("MHRA"), and retaliatory discharge in violation of the MHRA.  Defendant filed its Answer [doc. #3] on January 5, 2009, and then filed the pending Motion for Summary Judgment [doc. #14] on September 25, 2009.  Defendant also filed the pending Motion to Strike [doc. #23] on October 28, 2009, seeking to have several

_____

[1]As explained by Defendant in its Motion for Summary Judgment, Plaintiff's employer was actually Tyco Healthcare Group, LP, not Covidien, Inc., as Plaintiff named in her Complaint. However, Tyco Healthcare Group, LP does business using the Covidien name, and does not complain of a failure by Plaintiff to name the proper party.

declarations that Plaintiff attached to her Response to Defendant's Motion for Summary

Judgment stricken. The Court will address each of the pending Motions, in turn.

## II.    BACKGROUND FACTS[2]

In November 2003, when Plaintiff was 48 years old, she was hired by Defendant to work

in its Regulatory Services Department. The Regulatory Services Department is divided into a

domestic and an international side. Both sides use the same job titles (Associate I, Associate II,

and Senior Associate), although the work performed by the employees differs to some extent, and

the employees report to different managers. When she started in the Regulatory Services

Department, Plaintiff was an Associate I on the international side, and her manager was Charles

("Chuck") Smith. Plaintiff learned about the job from Melissa ("Missy") Henry, an employee of

Defendant. Ms. Henry was one of Plaintiff's closest friends, and was a reference for Plaintiff on

her job application.

Plaintiff worked as an Associate I on the international side from November 24, 2003, to

March 20, 2006. On March 20, 2006, Mr. Smith and James ("Jim") Baker, the Director of the

Regulatory Services Department and Mr. Smith's boss, promoted Plaintiff to Associate II on the

---

[2]The Court's recitation of the facts is taken from Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment [doc. #16] and Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts [doc. #19]. The Court also considered various exhibits, where appropriate.

The Court notes that, for some of the facts Plaintiff disputes, she fails to provide an appropriate citation to the record; specifically, in some instances, the evidence Plaintiff cites does not actually contradict Defendant's stated fact. To demonstrate that a genuine issue of material fact exists, a plaintiff must set forth affirmative evidence and specific facts showing there is a genuine dispute on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e)(2). When Plaintiff disputes a fact, but fails to cite to competent evidence that actually demonstrates the existence of a genuine issue of material fact, this Court will treat that fact as undisputed.

international side.  Plaintiff was 50 years old at the time of this promotion.  During the summer of 2007, Plaintiff asked her friend Ms. Henry about what was required to be promoted to a Senior Associate position.  At that time, Ms. Henry was a manager on the domestic side, so she was only able to give Plaintiff information about what a Senior Associate does on the domestic side.[3]  Ms. Henry also offered to help Plaintiff write a justification for her promotion.

On September 24, 2007, Plaintiff sent the following email to the President of the Business Unit, Tim Wright:

> Hi Tim,
>
> Denise Farnsworth here from Regulatory Affairs.
>
> This is a very trivial question I suppose, and one that will probably result in a black mark next to my name, but here goes.............
>
> I started working for Mallinckrodt in 1979 on the KOW® line at our Maryland Heights facility.  Back then Mallinckrodt gave New Years Eve and New Years Day as paid holidays.  Maryland Heights is a 24/7 facility and some of us had certain holidays that we had to work to keep the product supplied to our customers.  Even though we may have worked a particular holiday it was still considered a paid holiday by Mallinckrodt.  I may be wrong but I think this is the first time in Mallinckrodt's history that we have ever been scheduled to work December 31st!!!!!  I understand that we are allowed only so many days per year for the holidays.  If that is the case, why were we given Presidents Day-the most inconsequential day of the year to be off-and not New Years Eve?  I am totally flabbergasted.  Thanks [sic] goodness I have a couple of days of vacation left so I have the opportunity to take the day off and won't have to fly back home for one silly day.  (Unless of course there is a rule that no more than 3 people in one department can be on vacation at the same time....then there might be a problem.)
>
> Who was responsible for making this decision and what were they thinking???

---

[3]According to Plaintiff, Ms. Henry wrote in an email to Plaintiff that "I know what is required in my group.  I can give you a list of that."  She also stated, "You know, you don't do what we do.  So I'm sure it will entail different things."  (Farnsworth Depo., Def.'s Ex.A, doc.16-2, p.139).

I do not in any way intend to sound disrespectful. I just can't believe we will be here working on a day that has traditionally been a day off for Mallinckrodt's employees for years and years.

Many will have to cut short their vacations/holidays to come back for NEW YEARS EVE to work.

Please don't let this happen in the future....I will gladly give up President's Day or Spring Holiday to not have to work NEW YEARS EVE, the most celebrated day of the year in the entire world!!!!

OK, I'm done ranting and raving. (I think there may be others, though, once people realize that we won't be off for New Years Eve and they don't have any vacation days left to use.)

Thank you for your valuable time and patience.

I just had to get this off my chest or I was going to have a STROKE!!!

(Def.'s Ex. F, doc. #16-9). On October 22, 2007, Mr. Wright responded to Plaintiff that he had done a complete investigation of the holiday schedule for 2007 and found that the schedule was approved due to the way the dates fell on the calendar that year. Further, he stated: "I cannot do anything to change 07 but can be sensitive to the 08 plan based on your September 24 email." (Def.'s Ex. G, doc. #16-10). Plaintiff then forwarded Mr. Wright's response to others in the Regulatory Services Department with the comment: "FYI. Not a good enough reason if you ask me." (Def.'s Ex. G, doc. #16-10).

On November 15, 2007, Plaintiff sent an article about the regulatory services job market to Mr. Wright and to the Vice President of Human Resources, Lisa Britt. Plaintiff included the statement: "Maybe this is why Covidien can't compete with KV Pharmaceuticals (or any other pharmaceutical company for that matter) when it comes to obtaining/keeping employees." (Def.'s Ex. H, doc. #16-11).

On December 7, 2007, Mr. Smith and Mr. Baker received an email from Ms. Henry, which stated: "I think you need to consider placing Denise Farnsworth on a process improvement plan for her attitude and interaction skills. I know she works at her job, I just get tired of the constant complaining and the criticizing of the department. If she isn't happy here, there are other places to work!" (Def.'s Ex. I, doc. #16-12). Mr. Smith did not talk to Ms. Henry about her email, but he did tell Plaintiff that he had received a complaint about her attitude and that she needed to improve her behavior.

In December 2007, just before the holiday break, Mr. Smith told Plaintiff that she received a "meets expectation" for her performance, and an "at Covidien standard" for her behavior on her 2007 performance review (Def.'s Ex. K, doc. #16-14). Mr. Smith also told Plaintiff the amount of her pay increase. Although Plaintiff received a pay raise, she thought that it should have been higher. On December 17, 2007, Plaintiff emailed Human Resources Manager Nicole Amling to find out who she should talk to about her raise. Because Ms. Amling was out on maternity leave, David Cano, Senior Director of Human Resources and Ms. Amling's boss, responded to the email and advised Plaintiff that she should first talk with her manager and that Human Resources would facilitate that discussion if she wanted. Following Mr. Cano's advice, Plaintiff requested a meeting with Mr. Smith and Mr. Baker for January 2008, after people returned from Covidien's holiday break.

When she returned to work from the holiday break, Plaintiff learned (along with others in the Regulatory Services Department) that several people had been promoted, effective late December 2007. Two of the people who were promoted on the international side were Denise Miller and Brett Steckler. Both Ms. Miller and Mr. Steckler were under the age of 40 at the time,

and both were promoted from Associate I to Associate II, which was the same position that Plaintiff held. Plaintiff was not promoted and remained an Associate II on the international side. Other employees in the Regulatory Services Department, including Lacey Holman, who was 25 years old at the time, and Maryann Heras, who was 32 years old at the time, were not promoted in December 2007.

On January 7, 2008, at Plaintiff's request, Mr. Smith and Mr. Baker met with Plaintiff to discuss her pay raise, and to address Plaintiff's concerns about not being promoted to Senior Associate. During this meeting, Plaintiff learned that some of her co-workers had complained about her behavior. According to Plaintiff's deposition testimony, Plaintiff complained to Mr. Smith and Mr. Baker that she was upset because she had been training Ms. Miller and Mr. Steckler, and they were promoted to her level, even though she had been asking for a promotion since June 2007. Plaintiff could not recall whether she specifically questioned why younger employees were being promoted when she wasn't, but she testified that she was upset because she didn't think that the people who were promoted had been in the Regulatory Services Department long enough to have gained enough experience.

As part of the performance evaluation process, employees evaluate themselves by completing a performance evaluation. After an employee completes the evaluation, he or she submits it to the manager, who reviews it and can change it. On Plaintiff's 2007 performance evaluation, Mr. Smith assessed Plaintiff's job performance as "meets expectations" and assessed Plaintiff's behavior as "at Covidien standard." The evaluation did not include a description of the problems Mr. Smith had seen in Plaintiff's behavior. After the January 7, 2008 meeting with Plaintiff, Mr. Smith and Mr. Baker wrote an addendum to Plaintiff's 2007 performance

evaluation, with the assistance of David Cano in Human Resources. The addendum included those items that were not included in Plaintiff's performance evaluation. In the addendum, Plaintiff was told that her "behaviors rating was marginal" and the "[a]reas of specific concern around your behaviors include: negativity, complaining to others about the company, systems, promotions, individual composure, reaction to change, and involving others at work (outside of your immediate manager and HR) in your specific situation." (Def.'s Ex. M, doc. #16-16). On or about February 26, 2008, Mr. Smith gave Plaintiff her 2007 performance evaluation and addendum. Plaintiff reviewed the 2007 performance evaluation and addendum, and wrote comments and notes on the addendum.

According to her deposition, Plaintiff claimed that she was yelled at by a co-worker on February 14, 2008. After this altercation, Plaintiff sent the following email to everyone who attends the weekly international group meetings:

> Dear All,
> I will not be attending today's meeting or any other meetings in the future until someone can explain to me what it is that I am doing that is seen as negative and critical to everyone.
> I can not be expected to improve myself if I have no idea what it is I am doing. I don't think it is fair to put me in situations where I may offend others and yet not tell me what it is that I do that is so offensive.

(Def.'s Ex. N, doc. #16-17).

In late February or early March 2008, Michele Dietl replaced Mr. Smith as Plaintiff's manager, and Ms. Henry replaced Mr. Baker as Director of the Regulatory Services Department, after Mr. Baker left the company.

On March 14, 2008, Plaintiff sent an e-mail to several people in the Regulatory Services Department that included the following: "The EU wants our bags to conform to BOTH Dir

7

2002/72/EC and the Ph.Eur. 3.1.3 monograph for polyolefines. [They meet] the Dir requirements but [do] not meet EP 3.1.3 . . . how long have we been using this resin in our bags?????  Are our customers going to die of cancer now????"  (Def.'s Ex. O, doc. #16-18).  Plaintiff had been trained on the appropriate use of e-mail, including being careful about the words used in e-mails. On March 20, 2008, Plaintiff sent an e-mail to Ms. Henry, thanking Ms. Henry "for giving [Plaintiff] an example of one of [her] not so 'envious' traits."  (Def.'s Ex. P, doc. #16-19).  On March 27, 2008, Ms. Henry gave Plaintiff a Sparkler Award that noted Plaintiff's positive behavior.

At some point, Ms. Dietl and Ms. Henry decided to put Plaintiff on a Performance Improvement Plan ("PIP") because of Plaintiff's "performance and behavior," specifically because of "[h]er inappropriate behavior in the workplace."  (Henry Depo., doc. #16-5, p.27).  On April 3, 2008, Ms. Henry and Ms. Dietl met with Plaintiff.  The purpose and topic of this meeting is disputed.  Defendant asserts that the purpose of the meeting was to give Plaintiff a preview of the issues that would be presented to her in her PIP (which was not yet ready).  Plaintiff denies that she was presented with a preview of the PIP, and merely states that, during the meeting, Ms. Henry and Ms. Dietl suggested that Plaintiff get an appointment with the Employee Assistance Program to discuss her mounting stress.

At some point in March or April 2008, Ms. Henry received the entire employee file on Plaintiff.  The Parties dispute whether Ms. Henry requested the file from Mr. Smith in the process of finalizing the PIP for Plaintiff (Defendant's theory) or whether Ms. Henry obtained the file from Ms. Dietl, who received the file from Mr. Smith when she became Plaintiff's supervisor in March 2008 (Plaintiff's theory).  The file included two pages of handouts from a Violence in the

Workplace presentation that Plaintiff and others in the Regulatory Services Department attended

in the fall of 2007.  On the handouts, Plaintiff had handwritten comments next to some of the

printed information:[4]

> **The Signs** "that Boo[5] is Violent"
> !     **Red Flags**
>       "     **Outbursts of rage** "- FUCK!"
>       "     **Suicidal comments**
>       "     **Ominous threats** "- I'm going to throw you across the fucking room!!"
>       "     **Carrying a weapon**
>       "     **Obsessions**
>       "     **Extreme disorganization** "- Have you looked at my cube lately?"
>       "     **Noticeably changed behavior**
>
> **Additional Signs**
> !     **Personal History**
>       "     **Violent Behavior**
>       "     **Frequent job changes** "Mallinckrodt, Am Bottons, metc TRACE, St. Johns Mercy, Mallinckrodt, Fleming, KV, Mallinckrodt . . ."
>       "     **Domestic problems**
>       "     **Drug and alcohol abuse**
>       "     **Threats to others** "Stephanie, I'm going to kill you . . ."
> !     **Job Performance**
>       "     **Deterioration of job performance**
>       "     **Missed due dates** "- DONT [sic] ever have any!!"
>       "     "~~**Frequent absence**~~ never leaves ~~**from**~~ work station"
>       "     "**Increased** ~~**absenteeism**~~ overtime"
>       "     **Refusal to comply with rules** "that are <u>STUPID</u>!!"
>     "(These are just a few . . . ( )"

(Def.'s Ex. R, doc. #16-21).  After the Violence in the Workplace presentation, Plaintiff took the

two pages of handouts that she had written on, and laid them on Mr. Smith's chair while he was

in the bathroom.  Mr. Smith kept the notes in Plaintiff's file, and although he was disturbed by

---

[4]The language in bold font is the language that was printed on the handouts.  The language in quotation marks is the language that was added by Plaintiff, in her own handwriting.

[5]"Boo" is Plaintiff's nickname.

them, he did not notify Human Resources. Mr. Smith later testified that he did not believe that Plaintiff was being serious when she drafted the notes.

Upon reviewing the notes in Plaintiff's file, Ms. Henry notified Nicole Amling in Human Resources. Ms. Henry and Ms. Amling conducted an investigation into the handwritten notes on the handouts. They first spoke with Plaintiff, and Plaintiff admitted that she wrote the notes. After this meeting, Plaintiff was suspended pending further investigation. Ms. Henry and Ms. Amling completed their investigation and concluded that Plaintiff had in fact written the comments on the handouts.

Covidien's Guide to Business Conduct and Tyco's Guide to Ethical Conduct state: "All [Covidien/Tyco] facilities worldwide maintain a professional and harassment-free working environment - they are workplaces where employees act with respect for one another and for those with whom we do business." The Guides also state: "As a company, we expect all employees to treat one another with respect and dignity. Every employee has a unique role in making [Covidien/Tyco] a more inspiring and rewarding place to work. Our values are richly embedded in this commitment and are backed by many of the policies and practices outlined in this Guide." (Exs. B, C to Amling Dec., Def.'s Ex. L, doc. #16-15). Tyco's Code of Personal Conduct and Tyco's Salaried Handbook also state: "No employee shall threaten, intimidate, coerce, or interfere with another employee's work or use profane or abusive language, sexually or otherwise harass, or behave in an immoral or indecent manner towards another employee." (Ex. D to Amling Dec., Def.'s Ex. L, doc. #16-15; Def.'s Ex. S, doc. #16-23, p.42).

After the investigation, Ms. Henry, with the approval of Ms. Amling and Mr. Cano, decided to terminate Plaintiff's employment. Both Mr. Cano and Ms. Amling declared that

Plaintiff's discharge was warranted because Covidien does not tolerate threats in the workplace. When it was discovered that Plaintiff had written a threatening comment about a co-worker and other crude comments during a meeting discussing the importance of preventing violence in the workplace, Mr. Cano and Ms. Amling agreed that Plaintiff's behavior should not be tolerated and that discharge was appropriate. Both Mr. Cano and Ms. Amling declared that it did not matter that Plaintiff had written the comments several months earlier, that the threat was never carried out, or that Plaintiff claimed that the threat was a joke. Ms. Henry, Mr. Cano, and Ms. Amling testified or declared that Plaintiff had displayed disrespectful and unprofessional behavior by writing the comments and giving them to her manager. Additionally, according to Mr. Cano and Ms. Amling, the fact that Plaintiff made light of the serious subject of being aware of and trying to prevent violence in the workplace, and then displayed her flippant attitude about the subject toward her manager, made her conduct even more egregious. To the Management's knowledge, no other employee wrote threats (whether real or joke) on the Violence in the Workplace handouts, or engaged in other like conduct. Mr. Smith admitted that he would have no way of knowing whether other employees made threats on their handouts unless they actually gave their handouts to him. Mr. Cano never met Plaintiff in person, and did not know her age at the time that the decision to terminate her employment was made.

Plaintiff's employment with Covidien was terminated on April 10, 2008. Plaintiff was 52 years old at the time of her discharge. According to Ms. Henry, Covidien did not replace Plaintiff after her discharge; rather, Covidien redistributed Plaintiff's job duties to other members of the International Regulatory Services Department.

## III.   DEFENDANT'S MOTION TO STRIKE[6]

Defendant has moved to strike from the record certain portions of the declarations of Plaintiff, Diane Chappell, Sarah Ewalt, and Theodore Lodholz, which Plaintiff submitted as part of her opposition to Defendant's Motion for Summary Judgment.  Defendant asserts that portions of these declarations contain evidence that would be inadmissible at trial and statements that contradict the declarant's prior testimony under oath.

### A.   LEGAL STANDARD

Under Rule 56(e), the facts set forth to support or oppose a motion for summary judgment must be admissible in evidence to be considered by the Court.  *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003).  Evidence is admissible for the purpose of a summary judgment motion if it is in the form of either admissible documents or attested testimony, such as depositions or affidavits.  62 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 708 (L. Ed. 2007).  The court may "consider only admissible evidence" and is prohibited from using "affidavits and depositions that were made without personal knowledge, consisted of hearsay, or purported to state legal conclusions as fact."  *Murphy v. Mo. Dept. of Corrections*, 372 F.3d 979, 982 (8th Cir. 2004).  Inadmissable evidence "may not be

---

[6]As an initial matter, the Court notes that Defendant filed its Motion to Strike on October 28, 2009.  Plaintiff's Response to the Motion was due on November 9, 2009.  As of November 17, 2009, however, Plaintiff had not filed a Response, so this Court ordered Plaintiff to show cause, no later than November 27, 2009, why Defendant's Motion to Strike should not be granted.  Plaintiff filed her Response on November 27, 2009, but did not include any information as to why her Response was delayed, nor did she request leave to file a Response after the deadline.  Although the Court will not grant Defendant's Motion to Strike on this basis, it is extremely important for all Parties to observe and abide by the deadlines set by this Court and by the Local Rules.

used to support or defeat a motion for summary judgment." *Brooks v. Tri-Systems, Inc.*, 425

F.3d 1109, 1111 (8th Cir. 2005).

Additionally, the Eighth Circuit has held that when a witness's affidavit or declaration

conflicts with his or her earlier deposition testimony, the affidavit or declaration may be stricken.

*See Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498-99 (8th Cir. 2008).

## B.    DISCUSSION

### 1.    *Paragraph 4 of Plaintiff's Declaration*

First, Defendant seeks to strike paragraph 4 of Plaintiff's Declaration, which states:

> Approximately a week before Missy took over duties as the Interim Director of
> Regulatory [A]ffairs, in the spring of 2008, she and I had a conversation in the ladies
> second floor restroom in Bldg 30, where we both worked at the time.  I was coming
> out of the rest room as she was walking in.  I stopped and congratulated her on her
> upcoming promotion.  She smiled and we talked a bit.  Missy commented to me that
> the first thing she was going to do as Interim Director was to get rid of Chuck Smith
> and Michelle Dietl as they were both useless.  I knew she felt that way about Chuck
> but I was surprised that she felt the same about Michelle.  I know for a fact both
> Chuck and Michelle were over the age of 50 at the time of our conversation.

(Pl.'s Dec., doc. #20, p.2).  Defendant argues that this statement should be stricken because it

contains statements that conflict with earlier deposition testimony.  Specifically, Defendant cites

to the following testimony given by Plaintiff at her deposition:

> Q.    Okay.  And what about Missy Henry, do you think Missy Henry has any
> discriminatory animus against you for – because you are over the age of forty?
> A.    I have no idea.

(Pl.'s Depo., doc. #16-4, p.337).  Plaintiff argues that the statement in paragraph 4 of her

Declaration does not contradict Plaintiff's previously offered testimony.

First, the Court notes that the statement in paragraph 4 of Plaintiff's Declaration does not

establish that Ms. Henry had any discriminatory animus toward Plaintiff or any other employees

based on age. However, to the extent that Plaintiff is claiming that this statement is actually evidence of Ms. Henry's discriminatory animus, the Court finds that it directly contradicts Plaintiff's previous testimony that she had "no idea" whether Ms. Henry had any discriminatory animus toward her because of her age. Plaintiff cannot first testify that she doesn't know whether Ms. Henry had discriminatory animus, and then later change that testimony to state that Ms. Henry does have discriminatory animus toward people over the age of 40. This is especially true when the Plaintiff was aware of Ms. Henry's alleged statement in the restroom at the time that the first testimony was given. Accordingly, the Court will strike paragraph 4 of Plaintiff's Declaration.

2. *Paragraph Five of Plaintiff's Declaration*

Next, Defendant seeks to strike paragraph 5 of Plaintiff's Declaration, which states:

> A couple of months after my termination from Covidien, Stephanie Maher informed me that Maryann Herras (I am not certain of the spelling) had replaced me in International Regulatory Affairs. Maryann had previously worked in the domestic DMF department under Stephanie and was approximately 32 years old at the time. Based on my conversation with Stephanie, it was my understanding that Maryann was assuming my previous responsibilities for International Regulatory compliance in Australia, Canada and New Zealand and South America. Stephanie indicated Maryann had mentioned that Sonia Heroes (the Sales Manager for Mexico and Brazil) had asked why I was able to get documentation Sonia needed in a timely manner whereas Maryann was not able to do so.

(Pl.'s Dec., doc. #20, pp.2-3). Defendant seeks to strike this paragraph because it contains hearsay that would not be admissible at trial and because it is not based on Plaintiff's personal knowledge. Plaintiff argues that the statements are not hearsay because they are admissions by a party-opponent. Plaintiff also asserts that the residual hearsay exception set forth in Federal Rule of Evidence 807 applies.

The Court finds that Plaintiff's statement in paragraph 5 of her Declaration contains hearsay because it includes statements by someone other than Plaintiff, and those statements are being offered for the truth of the matter. *See* Fed. R. Evid. 801(c). Contrary to Plaintiff's argument, the Court finds that Ms. Maher's statements did not amount to an admission by a party-opponent because Plaintiff did not offer any proof that Ms. Maher was Defendant's agent, or that the subject of her statements were within the scope of her employment. *See* Fed. R. Evid. 801(d)(2)(D) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."). Additionally, the residual hearsay exception set forth in Federal Rule of Evidence 807 does not apply. This residual exception is to be "used very rarely, and only in exceptional circumstances." *United States v. Love*, 592 F.2d 1022, 1026 (8th Cir. 1979) (decided under former Fed. R. Evid. 804(b)(5)). "The statement must have 'circumstantial guarantees of trustworthiness,' and we examine the 'reliability of and necessity for the statement.'" *United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008) (quoting *United States v. Carlson*, 547 F.2d 1346, 1354 (8th Cir. 1976)). Plaintiff has not set forth, nor can the Court identify, any "circumstantial guarantees of trustworthiness" with respect to Plaintiff's hearsay statement regarding Maryann Herras.

Thus, the Court concludes that paragraph 5 of Plaintiff's Declaration contains hearsay that would be inadmissible at trial. Because inadmissable evidence "may not be used to support or defeat a motion for summary judgment," *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005), paragraph 5 of Plaintiff's Declaration will be stricken.

### 3. *Declaration of Diane Chappell*

Next, Defendant seeks to strike the Declaration of Diane Chappell.  According to her Declaration, Ms. Chappell was employed at Fleming at the same time as Plaintiff,[7] and Ms. Chappell worked in a supervisory capacity over Plaintiff during that time.  Ms. Chappell's Declaration includes a description of Plaintiff's behavior and attitude in the workplace while she was employed with Fleming.  It also includes information about alleged harassment by another employee that Plaintiff suffered while at Fleming, and attempts to discredit information Defendant obtained from other Fleming employees.

Defendant asserts that Ms. Chappell's Declaration "is filled with irrelevant statements regarding plaintiff's interactions with a former co-worker at plaintiff's prior employer, Fleming and Company, and the use of 'colorful language' at Fleming."  Defendant also argues that "the statements contained in paragraph 3 of Chappell's declaration should be stricken because they are not based on her personal knowledge."  (Def.'s Memo. in Support of Mtn., doc. #24, p.4).  In her Response, Plaintiff states, "Plaintiff would have been inclined to agree with Defendant's assessment [of irrelevancy] ***before*** Defendant thrust the issue into these proceedings by including a description of Plaintiff's separation from Flemming [sic] Co. in Defendant's Statement of Undisputed Material Facts."  (Pl.'s Response, doc. #26, p.5).  Plaintiff also argues that Ms. Chappell's Declaration does not contain hearsay.

---

[7]Plaintiff was employed as a chemist at Fleming Pharmaceuticals from about 1999 to 2003.

16

This Court finds that Ms. Chappell's Declaration is irrelevant to the issues presented in Defendant's Motion for Summary Judgment, and in this case as a whole. Defendant did include the following statement in its Statement of Undisputed Material Facts:

> After plaintiff's discharge, Covidien learned plaintiff made a false statement on her employment application. Plaintiff wrote on her Covidien job application that the reason for leaving her prior employer, Fleming and Company, was due to "downsizing due to economy." In truth, plaintiff was involuntarily terminated because of her angry outbursts and inappropriate behavior, such as "numerous examples of Denise [plaintiff] verbally abusing" co-workers and making "additional physical threats towards" a co-worker.

(Def.'s Facts, doc. #16, pp.11-12 (internal citations omitted; alterations in original)). However, Plaintiff's Complaint asserts claims that she was discriminated against, and ultimately discharged, because of her age. Defendant did not know about the false statements on Plaintiff's employment application until after she was discharged, thus, all of the events relevant to Plaintiff's discrimination claims must have occurred well before Defendant discovered the false statements. Because the false statements could not have impacted the way Plaintiff was treated while she was an employee of Defendant, and because it could not have been a factor in Defendant's decision to fire Plaintiff, any information about Plaintiff's work history and her failure to truthfully report it is irrelevant to this case. Thus, the Court will not consider the statement quoted above, nor will the Court consider Ms. Chappell's affidavit. The Court will grant Defendant's Motion to Strike the Declaration of Diane Chappell.

4.      *Declaration of Sarah Ewalt*

Defendant also seeks to strike the Declaration of Sarah Ewalt. According to her Declaration, Ms. Ewalt worked as a Regulatory Associate at Covidien until she left in January 2006. While she was employed at Covidien, Ms. Ewalt worked with Plaintiff, and with Melissa

"Missy" Henry. Ms. Ewalt's Declaration includes information about Ms. Henry's allegedly unprofessional and disruptive behavior at work. The Declaration also includes information about Plaintiff's behavior at work, and about the general workplace environment at Covidien.

Defendant asserts that Ms. Ewalt's Declaration "is full of irrelevant statements that lack any foundation to show she has personal knowledge of her far-reaching allegations." Defendant also states that "as Ewalt's employment ended with Covidien in January 2006, over two years before plaintiff's termination, her unsupported statements regarding Henry's behavior and that of the Regulatory Department are completely irrelevant." (Def.'s Memo. in Support of Mtn., doc. #24, p.5). Plaintiff argues that Ms. Ewalt's Declaration is based on her personal knowledge of the climate of the Regulatory Services Department and is relevant.

The Court finds that Ms. Ewalt's Declaration should be stricken. The statements contained within the Declaration regarding Ms. Henry's conduct two years before the events at issue took place are irrelevant. It is Plaintiff's behavior with which this Court is concerned. To the extent Plaintiff offers this evidence to demonstrate that she was treated differently than Ms. Henry, it must be rejected because Ms. Henry and Plaintiff are not similarly situated employees. *See Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000) ("the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct"). Additionally, the statements in the Declaration regarding Plaintiff's performance are irrelevant. Plaintiff's work performance more than two years before she was terminated does not rebut the evidence of Plaintiff's behavioral problems immediately prior to her termination. Finally, the statements in the Declaration regarding the work environment at Covidien go beyond Ms. Ewalt's personal knowledge. Statements by Ms. Ewalt such as, "the

entire department cursed," and "the company never took action to discourage or reprimand employees or managers for cursing in the workplace," go beyond what Ms. Ewalt, a non-managerial employee, could have known.

Accordingly, the Court will strike the Declaration of Sarah Ewalt.

        5.    *Declaration of Theodore Lodholz*

Finally, Defendant seeks to strike the Declaration of Theodore Lodholz. According to his Declaration, Mr. Lodholz worked as a Regulatory Affairs Associate at Covidien until he left on May 19, 2007. While he was employed at Covidien, Mr. Lodholz worked with Plaintiff, and trained her on numerous computer applications. Mr. Lodholz's Declaration includes information about Plaintiff's computer skills and her willingness to learn. It also includes information about Plaintiff's general demeanor at work and her personality. Additionally, Mr. Lodholz gives a general description of the workplace environment at Covidien.

Defendant argues that Mr. Lodholz's Declaration is "irrelevant and lacks the specific foundation needed to show he has personal knowledge of his statements." (Def.'s Memo. in Support of Mtn., doc. #24, p.5). Plaintiff argues that Mr. Lodholz's testimony is relevant and is based on his personal knowledge of the climate of the Regulatory Services Department.

The Court finds that Mr. Lodholz's Declaration should be stricken. First, Mr. Lodholz's Declaration is in large part about Plaintiff's computer skills prior to May 19, 2007, when Mr. Lodholz left Covidien. Plaintiff is correct that Exhibit B to the Declaration of Melissa Henry (Def.'s Ex. Q) includes an email from Ms. Henry, noting that Plaintiff "has failed to make the necessary progress with the computer to allow her to perform her job most effectively." However, this statement was one item in a long list of Plaintiff's behavioral problems, which Ms.

19

Henry set forth in an e-mail to Ms. Amling and Ms. Dietl, sent for the purpose of initiating disciplinary proceedings against Plaintiff. Defendant has not since cited Plaintiff's deficient computer skills as a reason for her termination, nor does Defendant now make that assertion. Furthermore, the state of Plaintiff's computer skills prior to May 19, 2007 is irrelevant to whether, by late March 2008, Plaintiff had "ma[de] the necessary progress with the computer to allow her to perform her job most effectively." Thus, the Court will strike any statements in Mr. Lodholz's Declaration regarding Plaintiff's computer skills.

The Court also finds that the other statements in Mr. Lodholz's Declaration regarding Plaintiff's attitude and conduct prior to May 19, 2007 are irrelevant. As set forth in the preceding section, evidence of Plaintiff's work performance approximately one year before she was terminated does not rebut the evidence of Plaintiff's behavioral problems immediately prior to her termination. And finally, the Court finds that the statements in Mr. Lodholz's Declaration regarding the work environment at Covidien go beyond his personal knowledge. Statements by Mr. Lodholz such as, "Management never discouraged, commented on, or reprimanded anyone regarding the use of foul language," and "Denise's use of foul language was in no way distinguishable from the other employees and managers who worked with her at Covidien," go beyond what Mr. Lodholz, a non-managerial employee, could have known.

Accordingly, Defendant's Motion to Strike will be granted, and the Court will strike the Declaration of Theodore Lodholz.

**IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**A.    LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, if the nonmoving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the absence of any genuine issue of material fact. *Id.* at 323; *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991). Once this burden is discharged, if the record does in fact

bear out that no genuine dispute exists, the burden then shifts to the nonmoving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e)(2). When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the nonmoving party must show there is sufficient evidence favoring the nonmoving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson*, 943 F.2d at 883.

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

**B.    DISCUSSION**

1.    *Discrimination under the ADEA*

First, Plaintiff asserts that Defendant discriminated against her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"). Under the ADEA, an employer is prohibited from discriminating against an employee because of his or her age. *See* 29

U.S.C. § 623(a). "A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009).[8] The United States Supreme Court recently established that, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009). Specifically, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Id.* "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.* at 2352.

It is not clear whether the holding in *Gross* also applies to ADEA cases involving only indirect evidence of discrimination. It appears from the outset that *Gross* would extend to such cases, but the Supreme Court also noted that "the Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 702, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), utilized in Title VII cases is appropriate in the ADEA context." *Gross*, 129 S. Ct. at 2349 n.2. The "evidentiary framework of *McDonnell Douglas*" that the Supreme Court referred to is the standard that the Eighth Circuit has historically applied in ADEA cases involving only indirect evidence of discrimination. *See King*, 553 F.3d at 1160 (ADEA case; "where the

---

[8]"Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). Cases involving only indirect evidence are those in which the plaintiff is only able to set forth circumstantial evidence of discrimination. *See Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008).

plaintiff presents indirect evidence of discrimination, the court analyzes her claim under the burden-shifting framework set forth in *McDonnell Douglas*"); *Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008) (ADEA case; "Where, as here, the plaintiff presents only circumstantial evidence of discrimination, we apply the familiar burden-shifting analysis of *McDonnell Douglas*."). Based on the Supreme Court's statement about *McDonnell Douglas*, numerous courts have continued to apply the *McDonnell Douglas* approach to ADEA cases involving only indirect evidence. *See Rahlf v. Mo. Tech. Corp., Inc.*, 2009 WL 5033955, at *2 (D. Minn. Dec. 15, 2009) (citing *Roberts v. USCC Payroll Corp.*, 635 F. Supp. 2d 948, 962 n.2 (N.D. Iowa 2009); *Woehl v. Hy-Vee, Inc.*, 637 F. Supp. 2d 645, 651 (S.D. Iowa 2009); *Schott v. Care Initiatives*, 2009 WL 3297290, at *5 (N.D. Iowa Oct. 15, 2009); *Healy v. Buhrs Americas, Inc.*, 2009 WL 3164771, at *4-*5 (D. Minn. Sept. 29, 2009); *Kolar v. Chamness Tech., Inc.*, 2009 WL 3157376, at *2-*3 (D. Neb. Sept. 28, 2009); *Jackson v. Lakewinds Natural Foods*, 2009 WL 2255286, at *3 n.4 (D. Minn. July 28, 2009)). Accordingly, because Supreme Court precedent is unclear at this time as to whether the *McDonnell Douglas* approach is applicable to ADEA indirect evidence cases, this Court believes that it is bound to follow Eighth Circuit precedent, which follows *McDonnell Douglas* in ADEA indirect evidence cases.

In this case, Defendant argues that the *Gross* "but-for" standard applies. In her Response, Plaintiff merely argues (incorrectly) that *Gross* does not apply because "the instant parties are not presently debating which [jury] instruction is appropriate." (Pl.'s Response, doc. #21, p.5). Apparently, neither Party is arguing that this is a case involving only indirect evidence, and thus, should be analyzed under *McDonnell Douglas*. At the same time, however, neither Party has identified any evidence that can be considered direct evidence of discrimination. This Court

believes that the only evidence that has been presented in this case is indirect evidence, and thus, the proper standard to apply is the *McDonnell Douglas* standard. However, in order to be thorough, the Court will analyze the case under both the *Gross* "but-for" standard and the *McDonnell Douglas* standard. The result is the same under each standard.

First, applying the *Gross* "but-for" standard, it is clear that Plaintiff has failed to set forth sufficient evidence to establish that Plaintiff's age was the "but-for" cause of her termination. While Plaintiff claims that she was terminated from her position because of her age, Defendant asserts that Plaintiff was terminated because she was disrespectful and unprofessional, and because she violated workplace policies. The evidence supports Defendant's explanation. In the months preceding her termination, Plaintiff engaged in conduct that can only be described as disrespectful to her superiors and colleagues, and generally unprofessional. For example, Plaintiff sent an email to Tim Wright, the President of the Business Unit, complaining about New Year's Eve not being a paid holiday in 2007. Mr. Wright responded to Plaintiff's e-mail in a professional manner, and provided a legitimate explanation. Plaintiff then forwarded Mr. Wright's e-mail to others in the Regulatory Services Department, with the comment "FYI. Not a good enough reason if you ask me." (Def.'s Ex. G, doc. #16-10). Another example of Plaintiff's disrespectful attitude is the article about the regulatory services job market that she sent to Mr. Wright and Vice President of Human Resources Lisa Britt, with the comment, "Maybe this is why Covidien can't compete . . . when it comes to obtaining/keeping employees." (Def.'s Ex. H, doc. #16-11). Additionally, Plaintiff sent an email to her colleagues who attended the weekly international group meetings, stating that she would not be attending their meetings until someone told her what she was doing that was offending others.

This disrespectful and unprofessional conduct violated Defendant's workplace policies, specifically Defendant's policies that all of its facilities must "maintain a professional and harassment-free working environment" and that its employees must "act with respect for one another." (Exs. B, C to Amling Dec., Def.'s Ex. L, doc. #16-15). Additionally, Plaintiff engaged in behavior that violated other workplace policies. For example, although Plaintiff had been trained on the appropriate use of e-mail, and had been told to be careful about the words used in e-mails in case of future litigation, Plaintiff forwarded an e-mail that she received regarding compliance of a product used by Defendant with a standard required by the EU. In direct contravention to her e-mail training, Plaintiff included the following statement: "The EU wants our bags to conform to BOTH Dir 2002/72/EC and the Ph.Eur. 3.1.3 monograph for polyolefines. [They meet] the Dir requirements but [do] not meet EP 3.1.3 . . . how long have we been using this resin in our bags????? Are our customers going to die of cancer now????" (Def.'s Ex. O, doc. #16-18). Upon reading the entire e-mail that prompted Plaintiff's comment about cancer, it is clear that Plaintiff both misstated the facts and provided evidence that could be used against Defendant in potential future litigation.

Perhaps the most egregious conduct by Plaintiff in this case was writing inappropriate and threatening comments on handouts she received at a Violence in the Workplace presentation, and then making them available for her supervisor to view. By writing, "I'm going to throw you across the fucking room!!" and "Stephanie, I am going to kill you . . . ," on the handout and then disseminating those messages, Plaintiff violated Defendant's workplace policy that, "[n]o employee shall threaten, intimidate, coerce, or interfere with another employee's work or use profane or abusive language, sexually or otherwise harass, or behave in an immoral or indecent

manner towards another employee." (Ex. D to Amling Dec., Def.'s Ex. L, doc. #16-15; Def.'s Ex. S, doc. #16-23, p.42). Additionally, the other comments Plaintiff wrote on the handouts are further evidence of Plaintiff's disrespectful and unprofessional behavior. This is especially true in light of the fact that Plaintiff wrote these comments on handouts that she received at a presentation on the very serious subject of preventing violence in the workplace. Regardless of whether Plaintiff's comments were meant to be taken seriously or as a joke, they violated Defendant's workplace policies and gave Defendant a legitimate reason to terminate Plaintiff.[9]

Although Defendant does not have the burden to demonstrate that Plaintiff's termination was legitimate and not discriminatory, it has set forth ample evidence to do just that. Plaintiff, for her part, has not set forth any persuasive evidence that establishes that her age was the "but-for" cause of her termination. Plaintiff merely argues that Defendant's explanation as to why she was fired was inadequate, and therefore, she infers that she was discriminated against and fired because of her age. Plaintiff does not dispute that she engaged in the aforementioned conduct, but she apparently asserts that it was not enough for her to be fired. However, this is not sufficient to establish a cause of action under the ADEA. This Court does not "'sit as [a] super-personnel department,' second-guessing the wisdom of businesses' personnel decisions." *Hill v.*

---

[9]Plaintiff makes much of the fact that she wrote the comments approximately eight months before she was terminated, and that two of her superiors were aware of the comments shortly after they were made, but did nothing to punish her. The Court finds this argument unpersuasive. The people who made the decision to fire Plaintiff did so very shortly after they discovered the comments on the handouts. The sequence of events does not suggest that the handouts were merely used to cover discriminatory actions. Moreover, it is not the Court's job to evaluate the timeliness of Defendant's Human Resources Department, because the ADEA does not "entitle courts to 'sit as super-personnel departments,' second-guessing the wisdom of businesses' personnel decisions." *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997) (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)).

*St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997) (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)).  Without citing to any actual evidence of age discrimination,[10] this Court cannot conclude that Plaintiff's age was the "but-for" cause of her termination.

Next, the Court will apply the *McDonnell Douglas* standard.  Under this standard, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  "To make such a case under the ADEA, the plaintiff must ordinarily show that: (1) he is a member of a protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was discharged; and (4) he was replaced by a younger worker."  *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004).  If "the plaintiff's responsibilities were not reassigned to a specific individual, . . . the plaintiff must satisfy the fourth element of the *prima facie* case by showing that age was a factor in the employer's decision to terminate."  *Id.* (internal citation omitted).  If plaintiff is able to establish a *prima facie* case of age discrimination, "the burden shifts to the defendant to 'produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'"  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)) (alteration in original).  If the defendant is able to do so, the burden then shifts back to the plaintiff, who must "'prove by a preponderance of the

_____

[10]Plaintiff repeatedly mentions that two younger employees, whom she helped train, were promoted to the Associate II position, the same position that Plaintiff held.  To the extent that Plaintiff relies on this evidence to support her age discrimination cause of action, the Court finds the evidence irrelevant.  It is not useful to compare these younger employees to Plaintiff because they held the Associate I position when they were promoted, and thus, were not similarly situated to Plaintiff.  *See Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000) ("the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct").

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 143).

Plaintiff cannot even establish a *prima facie* case of age discrimination. While it is clear that Plaintiff was a member of a protected age group, and that she was discharged from her position with Defendant, Plaintiff cannot show that she was performing her job at a level that met Defendant's legitimate expectations, or that she was replaced by a younger worker. As set forth in great detail above, Plaintiff conducted herself in a way that was unprofessional and disrespectful. She also violated Defendant's workplace policies on numerous occasions. This type of performance cannot be said to be at a level that meets Defendant's legitimate expectations. Additionally, Plaintiff was not replaced by a younger worker, rather, her duties were redistributed to other members of the International Regulatory Services Department. In such a situation, Plaintiff is permitted to establish the fourth element of her *prima facie* case by showing that age was a factor in the employer's decision to terminate. Again, as set forth in great detail above, Plaintiff has failed to offer any evidence whatsoever that her age was even a factor in Defendant's decision to terminate her employment. Plaintiff cannot establish a *prima facie* case of age discrimination, so the Court's *McDonnell Douglas* inquiry ends here.

Under both the *Gross* "but-for" standard and the *McDonnell Douglas* standard, this Court concludes that Plaintiff has failed to prove that she was discriminated against because of her age, in violation of the ADEA. Summary judgment is appropriate on this claim, in favor of Defendant.

2.     *Discrimination under the MHRA*

Plaintiff also asserts that Defendant discriminated against her because of her age in violation of the Missouri Human Rights Act ("MHRA"). The MHRA prohibits an employer from

discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . age." Mo. Rev. Stat. § 213.055.1(1)(a). "[T]he MHRA is less demanding than the ADEA. Under the MHRA, a plaintiff can survive a motion for summary judgment by showing a genuine issue of material fact as to whether 'age was a contributing factor in the [employer's] termination decision.'" *Baker v. Silver Oak Senior Living Mgmt. Co*, 581 F.3d 684, 689-90 (8th Cir. 2009) (quoting *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814 (Mo. 2007)) (second alteration in original). A court considering a summary judgment motion under the MHRA "must determine whether the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." *Daugherty*, 231 S.W.3d at 820 (citing *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. 1993)).

As discussed in detail in the preceding section, Plaintiff has failed to set forth any evidence whatsoever that her age was even a factor in Defendant's decision to terminate her employment. As a result, this Court cannot conclude that there is a genuine issue of material fact regarding whether age was a contributing factor in Defendant's decision to terminate Plaintiff's employment. Summary judgment is appropriate in favor of Defendant on Plaintiff's MHRA age discrimination claim.

### 3. *Retaliatory Discharge under the MHRA*

Finally, Plaintiff asserts that Defendant terminated her employment in retaliation for her complaining about age discrimination. The MHRA makes it unlawful for an employer "[t]o retaliate or discriminate in any manner against any other person because such person has opposed

any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any investigation, proceeding or hearing conducted pursuant to this chapter." Mo. Rev. Stat. § 213.070(2). "To establish a prima facie case of retaliatory discrimination a plaintiff must prove that: (1) she complained of discrimination; (2) the employer took adverse action against her; and (3) a causal relationship existed between the complaint of discrimination and the adverse employment action." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 245 (Mo. Ct. App. 2006). If the plaintiff "makes the prima facie showing, the burden of production shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for its actions." *Thompson v. W.-S. Life Assurance Co.*, 82 S.W.3d 203, 207 (Mo. Ct. App. 2002). If the defendant is able to do so, the burden then shifts back to the plaintiff to demonstrate that the defendant's "proferred reasons for acting are a pretext for illegal retaliation." *Id.*

In this case, Plaintiff is unable to establish a *prima facie* case of retaliation. First, Plaintiff has not established that she actually complained of age discrimination to Defendant. The only evidence that Plaintiff could possibly cite to prove that she did complain is in her deposition testimony, when she could not recall whether she actually questioned her superiors during a meeting why younger employees were being promoted when she wasn't. However, the testimony by Plaintiff that followed this statement of uncertainty demonstrates that Plaintiff was not in fact complaining about the age of the people who were promoted, rather she was complaining about their skill level and experience:

> Q. When you had this meeting with Jim [Baker] and Chuck [Smith], did you specifically say why are these younger people getting promoted and I'm not, or were you saying why are these people getting promoted?
>
> A. I do not remember.

Q.  Okay.

A.  Honestly.

Q.  Okay.

A.  I mean, they know that they're younger.  I mean -- but I don't know.

Q.  You know that they were younger.

A.  And they know that they're younger.

Q.  You assume that Jim and Chuck knew that they were younger.

A.  Yes.

Q.  But you don't remember specifically saying, "Why are these younger people getting promoted?"

A.  I -- I don't recall.  I'm sorry.

Q.  Okay.  But you definitely conveyed that to Jim and Chuck anyway, that you were upset that these other people were getting promoted and you were not?

A.  I was upset that the two people that I was training who were younger than me are now on my level.

Q.  Uh-huh.

A.  And now we're peers instead of me training them.  Now we're all on the same level.  I'm assuming getting paid the same amount of pay, and I'm the one that's been asking what does it take to be promoted.

Q.  And you were upset that the people who were promoted, the Denise Miller and Brett Steckler, were you upset that they were promoted because they were younger than you or because you had trained them?

A.  I felt that they hadn't been in the department long enough --

Q.  Because they --

A.  -- to have gained the experience, and if they were going to be promoted to my level, then it seems like I would be promoted one level beyond.

Q.  Okay.  So you were upset that because they had less experience than you, and then all of a sudden they were at the same associate two level that you were at, right?

A.  (Witness indicates head motion.)

Q.  That's what you were upset about?

A.  I was upset that I had been asking what does it take --

Q.  Uh-huh.  And --

A.  -- to get promoted.

Q.  And -- I should say, and you were upset that you -- because you felt that Denise and Brett were promoted to associate two, that you should then be promoted to a senior position so that you would stay ahead of them?

A.  I just felt that I knew more than they did.

(Pl. Depo., Def.'s Ex. A-2, pp.196-198).  From this testimony, which is the only evidence that Plaintiff could use to show that she complained about age discrimination, it is clear that Plaintiff only wanted to complain to her superiors that people with less experience were being promoted to her level, when she was not promoted to a higher level.  She did not intend to complain, nor did she actually complain, about the age of those receiving promotions.  Thus, Plaintiff has offered no affirmative proof that she actually voiced her complaint about younger employees getting promoted in lieu of older employees.

Moreover, even if Plaintiff had established that she complained to Defendant, Plaintiff has failed to demonstrate that a causal relationship existed between the complaint of discrimination and the adverse employment action.  Plaintiff has not offered any evidence connecting the meeting she had on January 7, 2008 with Mr. Smith and Mr. Baker to the decision by Ms. Henry, with the approval of Ms. Amling and Mr. Cano, to terminate Plaintiff's employment on April 10, 2008.

Considering the amount of time between the two events, and the fact that the people at the meeting were not the same people who were involved in the termination decision, the evidence demonstrates that there was no causal relationship. Plaintiff has not offered any evidence that would suggest otherwise.

Because Plaintiff is unable to establish a *prima facie* case of retaliation under the MHRA, the Court will grant summary judgment in favor of Defendant on this claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Strike [doc. #23] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [doc. #14] is **GRANTED**. Plaintiff's claims against Defendant are **DISMISSED, with prejudice**.

Dated this <u>11th</u> Day of <u>January</u>, 2010.


E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE